**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael K. Carroll, | ) | No. CV-07-00148-PHX-NVW |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| The City of Phoenix; Phillip Gordon; Jane | ) | |
| Doe Gordon; Peggy Bilstein; John Doe | ) | |
| Bilstein;  Michael Johnson;  Jane  Doe | ) | |
| Johnson;  Claude  Mattox;  Jane  Doe | ) | |
| Mattox; Peggy Neely; John Doe Neely;) | | |
| David Siebert; Jane Does Siebert; Tom) | | |
| Simplot; Jane Doe Simplot; Greg Stanton;) | | |
| Jane Doe Stanton, all individually and in) | | |
| their official capacities; and Roxanne Song) | | |
| Ong, individually and in her capacity as) | | |
| the presiding Judge of Phoenix Municipal) | | |
| Court; and John Doe Song Ong, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the court is Defendants' Motion to Dismiss the Complaint for Failure to State a Claim (Doc. # 5).

**I.    Background**

In this action under 42 U.S.C. §§ 1983 and 1985, Plaintiff Michael K. Carroll claims that the City of Phoenix violated his right to free speech under the First Amendment of the United States Constitution by terminating his employment as a judge of the Phoenix Municipal Court in response to complaints he lodged with Defendant Chief Presiding Judge

1   Roxanne Song Ong on matters of court administration.  Defendant Phillip Gordon is the
2   Mayor of the City of Phoenix.  Defendant David Siebert is the Vice Mayor of Phoenix.
3   Defendants Peggy Bilstein, Peggy Neely, Tom Simplot, Greg Stanton, Claude Mattox, and
4   Michael Johnson are members of the Phoenix City Council.  The Complaint makes the
5   following allegations.

6       The Phoenix Municipal Court consists of one chief presiding judge, one assistant
7   presiding judge, and multiple associated judges.  Appointments are made by a majority vote
8   of the City Council upon recommendation from an official Judicial Selection Advisory
9   Board.  A judge's term of office is four years and is renewable.  Although the City Council
10  need not reappoint a judge to a new term, the Council's longstanding practice has been to
11  reappoint nearly all judges.  Moreover, because reappointments often do not happen until
12  several months after the expiration of a judge's prior term, the City allows a judge whose
13  term has expired to continue to serve until action is taken on his or her application for
14  reappointment.

15      Carroll was first appointed in 1986.  During his tenure, he was known as a dedicated
16  and fair jurist, and he served on multiple court and bar committees, acted as a judicial liaison
17  between the Municipal Court and other arms of the city government, and worked as a faculty
18  member at the Arizona Judicial College, among other roles.  Carroll was reappointed three
19  times after his first term and served as a judge for approximately twenty years.  Although his
20  last term expired on January 13, 2006, he continued to hear cases for several months
21  afterward until his reappointment was denied.

22      During Carroll's time on the bench, the Municipal Court experienced a series of
23  changes in leadership.  In the early 1980s, the City Council selected Phoenix's chief
24  prosecutor, Louis Levin, as the court's chief presiding judge.  Judge Levin's lack of prior
25  judicial experience, however, complicated his ability to oversee the administration of the
26  court, and he left his position in 1992 amid accusations of poor management and
27  wrongdoing. To correct some of the problems encountered during Levin's tenure, the court's
28  remaining judges called for the Judicial Selection Advisory Board to recommend an

1   individual with judicial experience to fill the position of chief presiding judge.  The Board

2   heeded this request by recommending the appointment of Michael Lester, the assistant

3   presiding judge under Levin, to be the chief presiding judge, but the City Council instead

4   appointed Robert Dorfman, an assistant city attorney, as Levin's replacement.   Judge

5   Dorfman in turn selected Judge Lester as the assistant presiding judge.  When Judge Lester

6   retired, Judge Roxanne Song Ong, another experienced member of the bench, was selected

7   to take his place.  When Judge Dorfman retired in 2005, the City Council appointed Judge

8   Song Ong as the next chief presiding judge, a position she continues to hold today.

9           Initially, Carroll supported Judge Song Ong's appointment to be the chief presiding

10  judge.  However, that support quickly faded when Judge Song Ong picked Eric Jeffery to be

11  the court's assistant presiding judge.  Carroll objected to the selection because he believed

12  that the court had developed a practice and policy of choosing only experienced judges to fill

13  that position, and Judge Jeffery had less than one year of experience on the bench.  Carroll

14  expressed this view to Judge Song Ong through a series of emails and other correspondence

15  between December 2005 and March 2006.  The first of these emails, dated December 20,

16  2005, stated the following:

17              Roxanne–

18              I just saw the announcement.  I've given a lot of thought to our
             conversation last night.  In twenty years on this bench, I don't
19              think I have ever been as embarrassed for this court as I was
             when you announced your plans for the assistant presiding judge
20              position.  I don't know if that embarrassment was directed more
             at you or at some of the senior judges who, if what you tell me
21              is true, demonstrated so little regard for themselves and this
             court.  That you think a judge, who has been on the bench for
22              less than a year and who has only recently begun presiding over
             his *own* courtroom after coming from a long stint at the City
23              Prosecutor's Office, should suddenly be elevated to the assistant
             presiding judge position is a decision that is simply astounding
24              on every level.   The absurdity of someone, who has not yet
             undergone an evaluation by the attorneys who appear before
25              him, a reappointment process, or even a year at the job he was
             actually  appointed  to  perform,  potentially  participating  in
26              judicial performance reviews with judges who have been on the
             bench for decades is simply mind-boggling.  What could you
27              possibly be thinking?  I supported you wholeheartedly when you
             sought the position of presiding judge, despite the expressed
28              reservations of many.  I think my confidence in you may have

been misplaced.   Genuine leadership takes courage and inventiveness.  Your decision regarding the assistant presiding judge position demonstrates neither.  If the newest member of the bench can walk into the second highest judicial administrative position on the court after only a few months on the job, I guess you simply do not see the job demanding much in the way of judgment, experience, perspective or respect.  It certainly doesn't say much about how you must have viewed your own roll in your former position.

In any event, you have made your decision.  At this time, I am resigning from the Judicial Practices and Procedures Committee ["JP&P"].  Obviously, you and I have some major philosophical differences as to the direction the court should be taking. Furthermore, given the disregard you have demonstrated for the bench as a whole and me in particular, I doubt that my contributions or suggestions to that committee would be of much value to you or the court.

I have always felt that the judicial talent and resources on the court were grossly underutilized.  I see nothing in your first major decision as presiding judge to suggest that will change. I have always been willing and anxious to do whatever I could to make the court better.  I have never refused a request or shied away from a difficult task.  My dedication to this court is not diminished, but I honestly believe you are creating an environment in which such efforts are simply not recognized, cultivated or appreciated.   That is a managerial formula for disaster.

I know you have a lot going on now and I certainly do not want to add to your problems, but I honestly cannot abide your decision.  I think it was extremely cowardly of you to tell me before speaking to Judge Klausner, knowing and expecting that I would be the one left with the difficult task of relaying the distasteful news to her.  She deserved to hear it from you first, particularly since she had actively sought the position.  Please remove my name from the JP&P.

Doc. # 1, Tab B.  A second email dated January 13, 2006–coincidentally, the day on which

Carroll's last term expired–in turn read:

Roxanne–

Yesterday I received a photocopy of correspondence from Judge Jeffery to a defendant regarding the scheduling of a telephonic plea in my division.   That correspondence contained the heading: "Office of the Assistant Presiding Judge, Eric. L. Jeffery."

I'm confused.  I have been awaiting some indication from you as to exactly what you envision Judge Jeffery's duties to encompass, but nothing has been forthcoming from your office. I think it is becoming increasingly imperative, both from an

operations standpoint and for the sake of court morale and judicial collegiality, that you inform the full-time judges of this court as to what you consider to be the extent of Judge Jeffery's authority over the operation of the individual court divisions and the judges who preside in those divisions.

Upon the announcement of your plans for the assistant presiding judge position, I expressed to you that I felt it was extremely ill-advised to choose as an assistant presiding judge the one judge on the court with the absolute least amount of judicial experience (including most of the pro tem judges).  Judge Jeffery has been on the bench less than a year and has presided over a court division only a few months.  Much of his time in Division 604 was spent signing off on trial assignments out of Division 607 in your absence.  My initial concerns about your decision were assuaged somewhat when I was informed last week by Judge Garcia that you had expressed to him your intention to retain virtually all of the administrative duties you previously exercised when you held that position. Judge Garcia told me that you anticipated that Judge Jeffery would simply be assigning jury trials out of Division 607 and working on some "special projects" that you had not had the time to address while you were in the position of assistant presiding judge.

Admittedly, I was curious as to why Judge Jeffery would want to forego valuable judicial experience presiding over a regular trial division to simply sing [sic] off on courtroom assignments out of 607 and serve as a glorified law clerk, but I considered that to be an issue between you and him.  Also, I found it disconcerting that, at least from the perspective of the public and the Bar, the newest judge on the bench had suddenly been catapulted to ostensibly the second highest judicial position in the court without having had the time to even warm the chair on the trial bench.  I thought your decision spoke volumes about your true opinion regarding what you profess to be the "quality of our bench" and also about the individuals who have served as your colleagues during your tenure on this bench and offered you so much support when you began to assume administrative duties under Judge Dorfman.

Until I received a copy of the correspondence from Judge Jeffery's "office," I was not aware of the existence of an "Office of the Assistant Presiding Judge," nor am I aware of any authority creating such an "office" in the City Charter or Code.  It has been my understanding, since I started with the court in 1986, that the position of assistant presiding judge was a fairly informal one originally created by then Presiding Judge Levin for the purpose of coordinating courtroom assignments associated with the change to a "master" jury trial calendar and assisting the presiding judge in performing minor ministerial tasks.  Either the position has evolved into considerably more than what I have always perceived it to be, or Judge Jeffery has exhibited an imperial-like arrogance in attempting to create an "Office" where once there was simply another judge among equals, albeit one with a different assignment.

My concern is not strictly academic.  Do you envision Judge Jeffery as having the authority to approve or disapprove leave requests? Make courtroom assignments? Approve management development fund requests for legal education?  Approve pro tem judge assignments? Make non-judicial personnel decisions? Decide what legal research sources should be available for judges in their offices and on the bench?  Review attorney evaluations of judges?  Sit in on each judge's periodic performance evaluation and offer advice as to how that judge might improve?  Comment on a judge's periodic performance evaluation and offer advice as to how that judge might improve?  Comment on a judge's performance when that judge is up for reappointment? Formulate court policy, particularly as it relates to the court's interaction with other city departments, such as the Prosecutor's Office and the Police Department? This list could, of course, go on and on.  I have attempted to address only those functions that might significantly highlight Judge Jeffery's glaring lack of judicial experience and his general lack of knowledge and historical perspective regarding the court.

I assure you that my query is not meant to disparage Judge Jeffery.  I don't know Judge Jeffery well enough to have an opinion about his ability either as a judge or as an administrator. Frankly, he has not been on the bench long enough for me to even have much of an opportunity to get to know him personally.  Mine was not one of the courtrooms in which the Prosecutor's Office conducted its "Powerpoint Presentation" experiments, nor did Judge Jeffery appear very often in my courtroom, so I do not have even that limited exposure by which to assess his capabilities.

I would very much appreciate a candid response.  I have shared this memo with the other full-time judges on the bench only because I believe this situation calls for some frank discussion to replace the rumor, speculation and innuendo that has surfaced since you made your decision.  The judges on this court have a right and, perhaps more importantly, a need to know exactly what you consider to be the scope of Judge Jeffery's authority. It is simply a matter of common courtesy and respect.

Doc. # 1, Tab B. Judge Song Ong responded to these emails by convening a judge's meeting on January 25, 2006.  Without entertaining questions from her colleagues, she used the meeting to deliver a prepared statement allegedly aimed at curtailing the future expression of any dissenting opinions regarding her administration of the Municipal Court.  Afterward, Carroll expressed his thoughts on the meeting and Judge Jeffery in yet another email to Judge Song Ong that read as follows:

I believe I have a duty and an obligation to speak out whenever I perceive that the integrity or independence of this court might be in danger of being compromised.  I am not just a judge in

Division 606.  I am a judge of the Phoenix Municipal Court. Admittedly, I thought it was shocking when the newest judge on the bench was appointed the assistant presiding judge.  I expressed that to you privately both in person and in an e-mail. You had even assured me in my individual meeting with you that you had no intention of appointing one of the newest judges as the assistant presiding judge. I believed you.  After you made the appointment, I again wrote to you expressing my concerns, and received no reply.  It was only after you made it clear that you were not going to communicate further with me that I felt it necessary to find out how the rest of the bench regarded the news of Judge Jeffery's appointment.

I still do not understand how you could place a new judge, with less that [sic] a year of experience on the bench, in a position of overseeing a group of judges with over two hundred years of collective judicial experience.  I was initially pleased when you were appointed presiding judge because it was the first time in over 20 years that an experienced trial judge had been appointed as the presiding judge.  Since 1984, the presiding judge has been a former City Prosecutor with no judicial experience.  I was shocked, given that history, that the first official act of your administration was to appoint an assistant presiding judge with almost no judicial experience and fresh from administration in the prosecutor's office.  There is a public perception problem here if nothing else.  Judge Jeffery should have been given time to distance himself from the prosecutor's office and establish himself as a trial judge before leaping into administration.

My memo to you and the other judges on the bench was an attempt to determine the scope of Judge Jeffery's duties as the assistant presiding judge.  It was a legitimate inquiry.  While it may have forcefully expressed concerns about recent events, it did not disparage any members of this bench.  Your attempt, at today's meeting, to characterize it as a violation of city e-mail policy and the canons of judicial ethics was nothing more than an outrageous effort to intimidate me and every other member of this bench from voicing opinions about what goes on in this court except in the privacy of your office.  My e-mail to you was not public, nor was it intended to be public.  It was addressed to and intended only for the full-time judges on this bench.  It did not include the hearing officers.

How should I interpret what took place at the meeting today?  I am scheduled to appear before the [Judicial Selection Advisory Board] next Wednesday for my reappointment interview. Should I anticipate that I will have to defend my e-mail communication against allegations of judicial misconduct and violations of city e-mail policy before the [Board]?  Should I anticipate that, as a nonvoting member of the [Board], you will recommend against my reappointment?  At the grave risk of inciting your ire, I would, once again, appreciate the courtesy of a candid reply.

1    Doc. # 1, Tab C.  Hours after sending this email, Carroll and a Judge Klausner also met

2    personally with Judge Song Ong to discuss their different opinions about proper court

3    administration.  Carroll again expressed that he did not intend to undermine Judge Song

4    Ong's leadership, but rather felt compelled in the interest of the court to call upon her to

5    select an assistant presiding judge with more experience.

6         Angered by Carroll's conduct, Judge Song Ong allegedly made efforts to retaliate

7    against him.  When the Judicial Selection Advisory Board met on February 1, 2006, to

8    consider whether to reappoint Carroll to another four-year term, Judge Song Ong expressed

9    the sole voice of opposition.  She provided the Board with a typewritten summary of her

10   recent meeting with Carroll and copies of the emails he sent to her on December 20, January

11   13, and January 25.  Judge Song Ong also cross-examined Carroll about the propriety of the

12   emails in order to cast him in an unfavorable light before the Board.

13        Concerned for his future, Carroll attempted to quell Judge Song Ong's opposition to

14   the reappointment with the following letter, sent several days after the Board's meeting on

15   February 1:

16        Roxanne,

17        I never intended to personally offend either you or Judge Jeffery
         in the e-mails I wrote concerning his appointment as assistant
18        presiding judge. I know what I wrote was strongly-worded, but
         it is my passion for this Court and the work that we all do that
19        was my sole motivation in sending the e-mails. I did not intend
         in any way to challenge your authority to make the selection of
20        your choice.

21        Based upon my recollection of your comments to the [Judicial
         Selection Advisory Board], it appears that your concern
22        regarding my re-appointment was not related in any manner to
         my judicial abilities, but rather that I might not be able to
23        support your administrative leadership. I assure you that is not
         the case, nor were my comments ever intended to convey such
24        a notion. I recognize now that my approach should be different
         in the future, and you have my assurance that it will be.
25
         I have always, and will continue to follow the lead of the
26        presiding judge and any designee of that office. As discussed at
         the [Judicial Selection Advisory Board meeting], I thought after
27        our meeting in your office that we had moved forward, and that
         is still my desire. I assure you that I can and will do so.
28

- 8 -

1

2

Sincerely,
Michael Carroll

Doc. # 1, Tab B.  Carroll also apologized to the remaining Municipal Court judges on March

3

2, 2006:

4

To all of my colleagues on the bench:

5

6

7

8

9

10

I am very saddened by what has happened in our Court since I sent my e-mail regarding the scope of the assistant presiding judge's authority in January.  I regret that I hurt Judge Song Ong in sending the e-mail, I regret that she, understandably, viewed it as a challenge to her leadership, and I regret that it has chilled discourse among us.  I truly did not anticipate its destructive impact at the time I wrote and sent the e-mail.  If I could take it back, I would.  I never intended to hurt anyone.  I am truly sorry.

11

12

I wholeheartedly want to put this behind me and behind all of us and express my sincerest apology to Judge Song Ong and any other of my colleagues who took offense at this e-mail.  I hope we all move forward together and continue to demonstrate that our Court is an example to be emulated throughout the State.

13

14

Sincerely,
Mike Carroll

Doc. # 1, Tab B.  The Board ultimately voted to recommend Carroll's reappointment over

15

16

the reservations of Judge Song Ong.

17

Judge Song Ong next turned to members of the Public Safety Subcommittee of the

18

City Council on April 4, 2006, to communicate privately her opposition to Carroll's

19

reappointment.  By doing so, she aimed to discourage the Subcommittee from recommending

20

Carroll to the full City Council.  As before the Judicial Selection Advisory Board, however,

21

Judge Song Ong was alone in her opposition, and the Subcommittee chose not to heed her

22

advice.

23

Judge Song Ong finally expressed her opposition to the reappointment directly to the

24

City Council.  She first did so privately to individual Council members.  She then testified

25

during a public Council meeting on May 10, 2006, that she "couldn't run her court with

26

Judge Carroll on it."  Although Judge Song Ong was again alone in criticizing Carroll's

27

performance, the City Council unanimously declined his reappointment.  This decision was

28

based exclusively on the communications that Carroll sent to Judge Song Ong pertaining to

1  the selection of Judge Jeffery as the assistant presiding judge of the Municipal Court. Again,

2  these are the allegations of the Complaint, which are taken as true for the purposes of this

3  motion.

4       Count I seeks punitive damages on the ground that the City Council's decision to not

5  reappointment Carroll violated the First Amendment of the United States Constitution. The

6  parties stipulated to the dismissal of Count II, which alleged wrongful termination under

7  Arizona law. Defendants now move to dismiss Count I for failure to state a claim upon

8  which relief may be granted.

9  **II.    Standard of Review**

10      Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be

11  granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

12  of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th

13  Cir. 1994) (citations and internal quotation marks omitted). When analyzing a complaint for

14  failure to state a claim, all factual allegations are taken as true and construed in the light most

15  favorable to the nonmoving party. *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504

16  (9th Cir. 1994). If a complaint is dismissed, "leave to amend should be granted unless the

17  court determines that the allegation of other facts consistent with the challenged pleading

18  could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,

19  806 F.2d 1393, 1401 (9th Cir. 1986) (citations omitted).

20      In deciding a motion to dismiss under Rule 12(b)(6), a district court may take judicial

21  notice of "matters of public record outside the pleadings." *MGIC Indem. Corp. v. Weisman*,

22  803 F.2d 500, 504 (9th Cir. 1986). "Matters of public record" include state law. *See Lamar

23  v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any State of the Union, whether depending

24  upon statutes or upon judicial opinions, is a matter of which the courts of the United States

25  are bound to take judicial notice, without plea or proof."); *Carson v. Ft. Lauderdale*, 293

26  F.2d 337, 339 (5th Cir. 1961) ("Federal Courts are required to take judicial notice of state

27  laws.") (citing 28 U.S.C. § 1652); *see also Getty Petroleum Mktg., Inc. v. Capital Terminal*

28

1  *Co.*, 391 F.3d 312, 322-30 (1st Cir. 2004) (Lipez, J., concurring) (discussing the rationale and

2  history of judicial notice of state and local law).

3  **III.    Analysis**

4          Defendants raise three arguments in support of the motion to dismiss.  First, they

5  contend that Carroll's speech was not protected by the First Amendment because his status

6  as a judge on the municipal court made him a "policymaker" within the meaning of *Elrod*

7  *v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980).  Second, they

8  argue that even if Carroll is not a policymaker, each individual defendant is protected from

9  damages liability under the doctrine of qualified immunity.  Finally, Defendants contend that,

10 at the very least, punitive damages are not recoverable against the City of Phoenix or its

11 officers in actions brought under 42 U.S.C. §§ 1983 and 1985.  The arguments will be

12 addressed in the order raised.

13         **A.     Carroll was a "Policymaker" under the First Amendment**

14         Typically, a two-part inquiry is used to evaluate the claim of a government employee

15 who alleges that he suffered an adverse employment action as a result of engaging in speech

16 protected by the First Amendment.  First, it must be determined whether the speech involved

17 a matter of public concern, as revealed by its "content, form, and context."  *Connick v.*

18 *Myers*, 461 U.S. 138, 147-48 (1983).  "A public employee's speech or expressive conduct

19 deals with a matter of public concern when it can be fairly considered as relating to a matter

20 of political, social, or other concern to the community." *Cochran v. City of Los Angeles*, 222

21 F.3d 1195, 1201 (9th Cir. 2000) (internal quotation marks omitted).  Second, if it is

22 determined that the speech involves a matter of public concern, a balance must then be struck

23 "between the interests of the [employee], as a citizen, in commenting upon matters of public

24 concern and the interest of the State, as an employer, in promoting the efficiency of the

25 public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563,

26 568 (1968).  The employer's interest will outweigh the employee's interest "if the

27 employee's speech 'impairs discipline by superiors or harmony among co-workers, has a

28 detrimental impact on close working relationships for which personal loyalty and confidence

1    are necessary, or impedes the performance of the speaker's duties or interferes with the

2    regular operation of the enterprise.'" *Nunez*, 169 F.3d at 1228 (quoting *Rankin v. McPherson*,

3    483 U.S. 378, 388 (1987)).  The First Amendment will tolerate a firing decision only if the

4    speech did not involve a matter of public concern or the government's interest outweighs that

5    of the speaker.

6        *Connick* and *Pickering*, however, are not always directly applied to speech retaliation

7    claims for public employees.  Under what is known as the "*Elrod-Branti* exception," the First

8    Amendment withdraws its protection when the speaker-employee who suffered the adverse

9    employment action was a "policymaker."  The foundation for this rule was first expressed

10   in *Elrod v. Burns*, 427 U.S. 347 (1976), which addressed whether a government employer

11   violated the First Amendment by dismissing individuals holding the positions of office

12   supervisor, bailiff, and process server for refusing to support and become members of the

13   Democratic Party.  *Elrod* answered in the affirmative with regard to the facts at hand, but

14   also stated that the dismissal of individuals in "policymaking positions" on the basis of party

15   affiliation would be permissible under the First Amendment.  *Id.* at 367.  *Branti v. Finkel*,

16   445 U.S. 507 (1980), later expounded on *Elrod* by explaining that, in deciding whether an

17   employee falls within *Elrod's* policymaker exception, the "ultimate inquiry is not whether

18   the label 'policymaker' . . . fits a particular position; rather, the question is whether the hiring

19   authority can demonstrate that party affiliation is an appropriate requirement for the effective

20   performance of the public office involved."  *Id.* at 518.  "Party affiliation" is "broader than

21   party membership in that it includes commonality of political purpose and support."  *Biggs*

22   *v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999) (internal quotation marks

23   omitted).  To determine whether an employee was a policymaker under this standard, the

24   Ninth Circuit considers "[1] whether [the employee had] vague or broad responsibilities, in

25   addition to [his] [2] relative pay, [3] technical competence, [4] power to control others, [5]

26   authority to speak in the name of policymakers, [6] public perception, [7] influence on

27   programs, [8] contact with elected officials, and [9] responsiveness to partisan politics and

28   political leaders."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001).  In

1   applying these factors, the "relevant focus of analysis is the inherent duties of the position

2   in question, not the work actually performed by the person who happens to occupy the

3   office." *Biggs*, 189 F.3d at 997. The burden of establishing that an employee is a

4   policymaker rests with the government, with "cases of doubt being resolved in favor of" the

5   employee. *Elrod*, 427 U.S. at 368.

6        Given considerable disagreement concerning the circumstances in which the *Elrod-*

7   *Branti* exception applies,[1] it is useful to articulate the doctrine in light of its motivating

8   interests. In *Elrod*, it was explained that policymakers may be permissibly subjected to

9   patronage dismissal to ensure that "representative government not be undercut by tactics

10  obstructing the implementation of policies of [a] new administration, policies presumably

11  sanctioned by the electorate." 427 U.S. at 367. *Branti* alternatively indicated that a

12  policymaker may be discharged for expressing "private political beliefs [that] interfere with

13  the discharge of his public duties" because government employers have a "vital interest in

14  maintaining governmental effectiveness and efficiency." 445 U.S. at 517. By grounding the

15  policymaker exception in these interests, the cases both reflect the view that dissenting

16  political speech from a policymaker is, by rule, so disruptive that the state's interests will

17  necessarily permit a retaliatory employment action. At its core, this approach is not a

18  departure from the standard balancing analysis employed under *Connick* and *Pickering*, but

19  instead an abbreviated method for conducting the very same analysis. Rather than weighing

20  each of the various factors considered under *Pickering*, the implicit approach of *Elrod* and

21  *Branti* is to conclude that if an employee is a policymaker, the platform of his position

22  necessarily renders his dissenting political speech so influential that one may quickly

23  conclude that the disruptive effect of the speech always outweighs the speaker's individual

24  interest in commenting on matters of public concern.

25

26        [1] *See Rose v. Stephens*, 291 F.3d 917, 922 (6th Cir. 2002) (describing the different
    approaches among the circuits); Susan Lorde Martin, *A Decade of Branti Decisions: A*
27  *Government Official's Guide to Patronage Dismissals*, 39 Am. U. L. Rev. 11, 24-42 (1989)
    (same).
28

1    Multiple cases have addressed the status of judges under the standard articulated in

2    *Elrod* and *Branti*.  In *Kurowski v. Krajewski*, 848 F.2d 767 (7th Cir. 1988), two public

3    defenders for the state of Indiana filed First Amendment claims under 42 U.S.C. § 1983 after

4    they were fired for being Democrats.  The defendant argued in response that public defenders

5    in Indiana are policymakers because, even though they may not make policy in fulfilling their

6    standard duties, they are often appointed by the state's judges to serve as judges pro tempore,

7    a position that itself involves policymaking.  *Kurowski* rejected the defendant's argument,

8    but solely on the ground that judicial service is not part of a public defender's duties in

9    Indiana.  *Id.* at 770-71.  It was made clear that if judicial service had been part of the

10   plaintiffs' duties, they would have constituted policymakers because judges pro tempore are

11   policymakers in the state:

12            A judge both makes and implements governmental policy.  A
              judge may be suspicious of the police or sympathetic to them,
13            stern or lenient in sentencing, and political debates rage about
              such questions.  In most states judges are elected, implying that
14            the office has a political component.  Holders of the appointing
              authority may seek to ensure that judges agree with them on
15            important jurisprudential questions. . . .  What is true about the
              office of judge is true about the office of judge *pro tempore*.  It
16            is the same job; only the tenure of the officeholder differs.

17   *Id.* at 770.  Other cases have followed this reasoning.  In *Newman v. Voinovich*, 986 F.2d 159

18   (6th Cir. 1993), an attorney who was a registered Democrat filed a First Amendment claim

19   after the Governor of Ohio, a Republican, passed over his application to fill a position as a

20   judge on a county court of common pleas.  Citing *Kurowski*, the Sixth Circuit found that the

21   plaintiff had failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) because

22   "judges are policymakers within the meaning of *Elrod* and *Branti*."  *Id.* at 163.  This

23   conclusion was based on the fact that the office of judge "involves making on the state's

24   behalf the sort of decisions about which there are political debates."  *Id.*

25          Similarly, *Walsh v. Heilman*, 2006 U.S. Dist. LEXIS 26299, 2006 WL 1049598 (N.D.

26   Ill. Apr. 19, 2006), held that an individual who was appointed by a village's mayor to serve

27   as an administrative hearing officer was a policymaker under *Elrod* and *Branti* because he

28   possessed powers similar to those held by state and federal judges, including the power to

make authoritative legal determinations pertaining to the village code, issue findings of fact, impose fines and penalties, preside over hearings, administer oaths, issue subpoenas, hear testimony and accept evidence, and rule on objections and the admissibility of evidence. *Id.* at *14-15, 2006 WL 1049598, at *3-4. These powers constituted indicia of the officer's policymaker status because they could be utilized in a discretionary fashion to either thwart or promote the political agenda of the village mayor. *Id.* at *16, 2006 WL 1049598, at *5.

*Garretto v. Cooperman*, 510 F. Supp. 816, 818-19 (S.D.N.Y. 1981), is also instructive. In that case, a worker's compensation law judge alleged that the state worker's compensation board violated the First Amendment by declining to reappoint her solely on the basis of her status as a registered Republican. Noting that her duties were to hear and determine compensation claims primarily based on "job-related injury, non-job-related disability benefits, discrimination, and retaliation," *id.* at 818, *Garretto* held that the judge was a policymaker under *Elrod* and *Branti*, *id.* at 819. The basis for this holding was that compensation law judges "who approach the task of adjudication from different points on the political spectrum will produce markedly different results in the functioning of the compensation system." *Id.* Because a "judge whose political or social philosophy favors a generous paternalistic compensation system will reach results which are often at odds on disputed questions from a more conservative judge who believes in holding down industrial costs," the elected administration could properly accomplish its objectives by declining to reappoint a judge of an opposing political orientation. *Id.*

It is apparent from these cases and the factors identified in *Walker* that, at least for the purpose of evaluating the City Council's reappointment decision, Carroll was a policymaker while employed as a judge on the Phoenix Municipal Court. To reach this conclusion, the court takes judicial notice of the laws of the state of Arizona and the City of Phoenix as they shed light on the characteristics of Carroll's former office. *Weisman*, 803 F.2d at 504; *Carson*, 293 F.2d at 339. First, Carroll's position gave him responsibility over a wide range of civil and criminal actions under Arizona law, including "all cases arising under the ordinances of [the City of Phoenix] . . . and . . . violations of laws of the state committed

1    within the limits of the [City of Phoenix]."  A.R.S. § 22-402.  The jurisdiction of the

2    Municipal Court extends over misdemeanor DUI cases, *see* A.R.S. § 28-1552, civil traffic

3    violations, *id.*, juvenile offenses, *see* A.R.S. 8-201(4), and civil actions to enforce municipal

4    ordinances, *see* A.R.S. § 22-406.  By handling cases of such topical breadth, Carroll

5    shouldered responsibility at least as broad as that found consistent with policymaker status

6    in *Walsh* and *Garretto*.  *See Walsh*, 2006 U.S. Dist. LEXIS 26299, at *7-9, 2006 WL

7    1049598, at *3-4 (describing the administrative hearing officer's authority to hear cases

8    involving alleged violations of the village and municipal codes); *Garretto*, 510 F. Supp. at

9    818 (describing the worker's compensation law judge's authority to decide various types of

10   worker's compensation claims).  Second, the position of judge on the Municipal Court

11   requires a high level of technical expertise in matters of state and local law, both procedural

12   and substantive.  *Cf. Biggs*, 189 F.3d at 995 (explaining that the technical legal expertise of

13   city attorneys favors the conclusion that they are policymakers).  Third, judges on the

14   Municipal Court have substantial power to control others.  The Arizona Revised Statutes

15   authorize them to impose civil penalties such as fines and forfeitures, A.R.S. §§ 5-395.03(C),

16   12-114.01(A), 13-803(D), 22-404, 22-405, 28-797, commit juveniles to competency

17   restoration programs, A.R.S. § 8-291.09(E), issue protective orders, A.R.S. § 13-3602(D),

18   issue injunctions, A.R.S. § 12-1809(N), sentence individuals to probation or imprisonment,

19   A.R.S. §§ 13-901(A), 22-429, and issue subpoenas, A.R.S. § 22-423.  This authority extends

20   beyond that possessed by the policymaking judicial officer in *Walsh*.  *Compare, e.g.*, *Walsh*,

21   2006 U.S. Dist. LEXIS 26299, at *9, 2006 WL 1049598, at *3 ("In no event shall a hearing

22   officer have the authority to . . . [i]mpose a penalty of incarceration.") *with* Phoenix City

23   Code, Art. III., sec. 2-100(A) (establishing a municipal court judge's authority to impose a

24   sentence of jail confinement or home detention).  Fourth, in light of our common law

25   tradition, the public tends to perceive judges of all kinds as policymakers who shape the law

26   by creating precedent.  Fifth, judges on the Phoenix Municipal Court possess de facto

27   authority to speak in the name of the City's policymakers.  As appointees of the City

28   Council, they operate as agents of the city government.  By applying local law in criminal

and civil actions, they give voice to the policies of the elected officials who appointed them. Finally, judges on the Municipal Court exercise substantial influence on the implementation and success of City programs.  In large part, this is facilitated by state and local law that allows the judges to exercise discretion in presiding over trials, *see, e.g.*, *State v. Municipal Court*, 160 Ariz. 324, 325-26, 772 P.2d 1177, 1178-79 (Ct. App. 1989) (discussing a superior court judgment that Judge Carroll did not abuse his discretion by setting pre-trial hearings on motions to strike allegations of a prior conviction), issuing civil penalties, *see, e.g.*, Phoenix City Code, Art. III, Sec. 2-97(A) (permitting a judge to waive fees for a default judgment entered in a traffic case if payment would cause hardship to the defendant), and imposing criminal sentences,  *see, e.g.*, Phoenix City Code, Art. III, Sec. 2-100 (permitting a judge to substitute home detention for jail confinement), among other matters.  In any given case, judges may utilize this discretion to influence trial outcomes and impose penalties of varying severity based on the extent to which they personally prioritize crime control, orderly streets, or any other relevant policy goal.  Carroll's position was in this sense indistinguishable from that of the compensation law judge in *Garretto*, whose authority enabled her to promote particular policy outcomes "at the questionable fringes" of the law. 510 F. Supp. at 819.

The three remaining factors identified in *Walker*–i.e., contact with elected officials, responsiveness to political leaders, and relative pay–do not strongly support the finding that Carroll was a policymaker.  Judges on the Municipal Court are expected to apply the law in a fair and neutral fashion regardless of the prevailing political climate, and they do not maintain regular contact with elected officials. *See Winter v. Coor*, 144 Ariz. 56, 695 P.2d 1094 (1985) (describing the importance of judicial independence in reference to municipal court judges).  The pay grade of these judges, moreover, is the same as that of judges on the Superior Court of Arizona, with benefits equivalent to those provided for in the City's "middle management" pay plan.  Phoenix City Code, Art. III, Sec. 2-83.1(A).  In the end, however, these factors are insufficient to outweigh the factors discussed above. The judicial positions examined in *Kurowski*, *Newman*, *Walsh*, and *Garretto* also involved some level of

political independence and presumably failed to provide highly lucrative pay packages. The political insulation of Carroll's former position also does not overcome the fact that the position confers authority to make discretionary decisions that shape the content and implementation of state and local law on a variety of issues. It is that authority in particular that weighs in favor of finding that judges on the Phoenix Municipal Court are policymakers.[2]

The position of municipal court judge also contrasts with positions that have been held not to trigger the *Elrod-Branti* exception. *Flynn v. City of Boston*, 140 F.3d 42, 45 (1st Cir. 1998), indicates that non-policymaking positions have included "cleaning supervisor . . . career employee administrative aide . . . floor supervisor . . . guard . . . process server . . . assistant public defender . . . rehabilitation counselor . . . road equipment operator . . . garage worker, and . . . dietary manager." While Carroll's responsibilities were not as significant as those of other judges in the state courts, they were far more substantial than those of the traditional non-policymaking public employee.

Plaintiff touches upon an ambiguity in the case precedent by next arguing that even if his position was materially similar to the judicial offices examined in the prior cases, the *Elrod-Branti* exception does not apply here because the City's adverse employment action was not motivated by disapproval of Carroll's political affiliation. From Ninth Circuit precedent, it is somewhat unclear whether the exception applies when a policymaker suffers

---

[2] Carroll cites to *Gregory v. Ashcroft*, 501 U.S. 452 (1991), to make the point that policymaker status is determined on a case-by-case basis. The point is well taken, but *Gregory* itself is inapposite. That case addressed whether the Age Discrimination in Employment Act ("ADEA") contains a statement proscribing discrimination against state judges in sufficiently plain terms to permit a lawsuit by a judge against a state under the Eleventh Amendment. Because the Act does not cover discrimination against state "appointee[s] at the policymaking level" and judges "exercise . . . discretion concerning issues of public importance," *Gregory* held that judges do not so plainly fall outside of the ADEA's policymaker exclusion to permit lawsuits by judges against states. *Id.* at 466-67. The case does not actually decide whether judges are policymakers under the ADEA, and it certainly does not apply *Elrod* or *Branti* or any of the factors that courts use to determine policymaker status for the purpose of the First Amendment.

1    retaliation for engaging in any type of speech, or whether it applies only when the retaliation

2    is politically motivated.[3]   The Sixth Circuit reads Ninth Circuit precedent as holding that

3    policymaker status alone is sufficient to trigger the *Elrod-Branti* exception. *See Rose*, 291

4    F.3d at 922.  In *Biggs*, 189 F.3d at 994-95, moreover, it was stated that "an employee's status

5    as a policymaking . . . employee [is] dispositive of any First Amendment retaliation claim."

6    However, no Ninth Circuit cases have had the occasion to address whether the *Elrod-Branti*

7    exception applies when a policymaker is fired for non-political reasons, as they all involved

8    employees who were fired over uncontestedly political disputes.  *See Walker*, 272 F.3d at

9    1120-22 (involving a policymaker left out of its employer's request for bids after allegedly

10   accusing the employer of racism in the provision of housing); *DiRuzza v. County of Tehama*,

11   206 F.3d 1304, 1306 (9th Cir. 2000) (involving a deputy sheriff allegedly fired for supporting

12   the sheriff's opponent during elections); *Biggs*, 189 F.3d at 992 (policymaker fired because

13   she and her family actively opposed the mayor and city council on political issues); *Fazio*

14   *v. City of San Francisco*, 125 F.3d 1328, 1330 (9th Cir. 1997) (policymaker allegedly fired

15   for running for office against his superior).  Language from the cases also suggests that the

16   Ninth Circuit would consider the motive for the retaliation if it were actually an issue and

17   limit the *Elrod-Branti* exception to cases involving dissenting political speech.  *See id.* at

18

─────────────────

19        [3] If status alone is dispositive in the Ninth Circuit, that approach could rest on the view

20   that an exception to First Amendment protection for policymakers engaging in political

     speech, the "core of the First Amendment," *Randall v. Sorrell*, 126 S. Ct. 2479, 2502 (2006)

21   (Thomas, J., concurring), must surely also permit terminations on the basis of non-political

     speech for which the Constitution is less solicitous. *See R.A.V. v. St. Paul*, 505 U.S. 377, 422

22   (1992) (Stevens, J., concurring) ("Our First Amendment decisions have created a rough

23   hierarchy in the constitutional protection of speech.  Core political speech occupies the

     highest, most protected position; commercial speech and nonobscene, sexually explicit

24   speech are regarded as a sort of second-class expression; obscenity and fighting words

25   receive the least protection of all.").  On the other hand, neither *Elrod* nor *Branti* addressed

     circumstances involving non-political speech, and the stated rationale for those cases applies

26   with less force when the policymaker suffers retaliation for other types of speech. *Cf. Elrod*,

27   427 U.S. at 367 (explaining that a patronage dismissal of a policymaker is justified as a

     means of ensuring that "representative government [is] not . . . undercut by tactics

28   obstructing the implementation of policies" of an administration).

1331 (citing *Elrod* for the proposition that a policymaker "may be fired for *political reasons* without offending the United States Constitution" and explaining that the "rationale utilized to permit patronage dismissals in *Elrod* and *Branti* may also be applicable in the context of dismissals that are based on a public employee's *political activities*") (emphasis added); *Walker*, 272 F.3d at 1132 (explaining that *Elrod* and *Branti* apply to firings based on "party affiliation" or "political affiliation").

Given the allegations in this case, it is unnecessary to decide whether the *Elrod-Branti* exception applies outside the context of politically motivated retaliation against a policymaker. The Complaint shows that Carroll's speech implicated his substantive political views on multiple levels and elicited a politically motivated response from the City Council. For example, in the email dated December 20, 2005, Carroll stated to Judge Song Ong that the two of them had "major philosophical differences as to the direction the court should be taking." Doc. # 1, Tab B. He objected to the selection of Judge Jeffery as a "gross[] underutiliz[ation]" of court resources. *Id.* He also asserted that Judge Jeffery's selection would damage the reputation of the court among the public and the bar, both by demonstrating disregard for the accumulated experience of the other judges and calling into question the independence of the Municipal Court from other branches of the City's government. *See id.* ("I found it disconcerting that, at least from the perspective of the public and the Bar, the newest judge on the bench had suddenly been catapulted to ostensibly the second highest position in the court without having had the time to even warm the chair on the trial bench."); Doc. # 1, Tab C ("There is a public perception problem here if nothing else. Judge Jeffery should have been given time to distance himself from the prosecutor's office and establish himself as a trial judge before leaping into administration."). By challenging the decision of the chief presiding judge on these grounds, Carroll instigated a dispute and adverse response by the City Council over classically political issues. Either possible version of the *Elrod-Branti* exception would apply in these circumstances. *Cf. Walker*, 272 F.3d at 1133 (applying the *Elrod-Branti* exception to circumstances involving

political speech); *Fazio*, 125 F.3d at 1331 (construing *Elrod* to permit the termination of a policymaker "for political reasons").

Finally, Carroll argues that policymaker status will effectively deprive judges on the Phoenix Municipal Court of their entire right to free speech under the First Amendment. That is not necessarily true. Judges on the Phoenix Municipal Court are policymakers for the purpose of evaluating politically motivated adverse *appointment* decisions by the City Council. A judge terminated during his term might have a different case if the application of the policymaker exception in that context undermines the representation and efficiency interests articulated in *Elrod* and *Branti*. This case presents no issue of mid-term termination for speech reasons. Such a case is unlikely to arise in light of Arizona's constitutional prohibition of mid-term removal of municipal court judges except for cause. *See Winter*, 144 Ariz. 56, 695 P.2d 1094.

**B.    Even if Carroll were not a Policymaker, the Individual Defendants are Entitled to Qualified Immunity**

Relying on the doctrine of qualified immunity, Defendants also move to dismiss the Complaint insofar as it seeks damages against the individual Defendants in their personal capacities. Qualified immunity is "an entitlement not to stand trial" rather than a "mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Safeguarding "'all but the plainly incompetent or those who knowingly violate the law,'" *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), the immunity applies if two requirements are satisfied: First, "[t]aken in the light most favorable to the party asserting injury," the facts alleged must "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the law must be so "clearly established" at the time of the alleged unconstitutional action that "a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The "plaintiff shoulders the burden of proving that the right[] he claims [is] 'clearly established.'" *Brewster*, 149 F.3d at 977. "If the only reasonable conclusion from binding authority was that the disputed right existed, even if no case had

1    specifically so declared, defendants would be on notice of the right and they would not be

2    qualifiedly immune if they acted to offend it." *Blueford v. Prunty*, 108 F.3d 251, 254 (9th

3    Cir. 1997).

4           The individual defendants are entitled to qualified immunity under this authority.

5    Even assuming that Carroll was not a policymaker and that the Complaint therefore states

6    a claim for the violation of Carroll's right to free speech under the First Amendment, such

7    a right was not clearly established at the time Defendants declined to reappoint Carroll.  First,

8    substantial case authority suggested that Carroll is a policymaker.  *See Newman*, 986 F.2d

9    at 163; *Kurowski*, 848 F.2d at 770; *Walsh*, 2006 U.S. Dist. LEXIS 26299, at *14-16, 2006

10   WL 1049598, at *5-6; *Garretto*, 510 F. Supp. at 818-19.  Defendants could have reasonably

11   concluded in light of that authority that the First Amendment would permit an adverse

12   employment action in the circumstances.  Although no case has examined the precise

13   position of judge on the Phoenix Municipal Court under *Elrod* and *Branti*, the similarities

14   between that position and the judicial offices that were examined in the other cases are

15   multiple.  *See, e.g.*, *Walsh*, 2006 U.S. Dist. LEXIS 26299, at *7-9, 2006 WL 1049598, at *3-

16   4 (describing the duties of the policymaking position of administrative hearing officer).

17          Second, assuming it was clearly established that judges on the Phoenix Municipal

18   Court are not policymakers, Carroll would still have to show that his right to speak as he did

19   was clearly established under *Connick* and *Pickering*.  *See Hufford v. McEnaney*, 249 F.3d

20   1142, 1148 (9th Cir. 2001) ("In order to show that qualified immunity should not apply,

21   [plaintiff] must show that two things were clearly established at the time of his termination:

22   (1) that his speech involved a matter of public concern and (2) that the interests served by

23   allowing him to express himself outweighed the state's interest in promoting workplace

24   efficiency and avoiding workplace disruption."  (internal quotation marks omitted)).  This

25   he has failed to do.  From the face of the Complaint, Carroll's speech touched upon several

26   issues of public concern–including government resource allocation, the public perception of

27   city officials, and judicial independence–but was also substantially disruptive of the decorum,

28   collegiality, and even civility of the Municipal Court.  It was not "clear" in light of these

1   circumstances that Carroll's interest in speaking on matters of public concern outweighed the

2   disruptive impact of his speech under *Pickering*.  Carroll may therefore not recover damages

3   against any individual Defendant sued in his or her personal capacity.

4       **C.    Punitive Damages**

5       Defendants correctly contend that punitive damages may not be awarded against the

6   City of Phoenix or any individual defendant sued in his or her official capacity.  *See City of*

7   *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities are

8   immune from punitive damages under 42 U.S.C. § 1983); *Mitchell v. Dupnik*, 75 F.3d 517,

9   527 (9th Cir. 1996) (barring punitive damages against government officers sued in their

10  official capacities under 42 U.S.C. § 1983).

11      IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss the Complaint

12  for Failure to State a Claim (Doc. # 5) is GRANTED.

13      IT IS FURTHER ORDERED that the Complaint (Doc. # 1) and this action are

14  dismissed with prejudice.  The clerk shall enter judgment accordingly and terminate this case.

15      DATED this 17th day of April 2007.

16

17

18      _____
            Neil V. Wake
19          United States District Judge

20

21

22

23

24

25

26

27

28